COURT OF APPEALS
DECISION
DATED AND FILED

October 18, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1397**

STATE OF WISCONSIN

Cir. Ct. No. 2019TP235

IN COURT OF APPEALS
DISTRICT I

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.W., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

D.W., JR.,

      RESPONDENT-APPELLANT.

      APPEAL from an order of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1     BRASH, C.J.[1] D.W., Jr. appeals the order of the trial court terminating his parental rights to J.W.  D.W., Jr. argues that the trial court erroneously exercised its discretion in determining the best interests of J.W. by failing to consider relevant evidence, particularly with regard to D.W., Jr.'s request that a guardian be appointed for J.W. as an alternative to termination. Upon review, we reject D.W., Jr.'s arguments and affirm.

## BACKGROUND

¶2     D.W., Jr. is the adjudicated father of J.W., who was born in December 2013.  D.W., Jr. was incarcerated when J.W. was born.  J.W. initially lived with his mother, L.T.H., and two siblings.[2]

¶3     In April 2014, the Division of Milwaukee Child Protective Services (DMCPS) received a referral regarding J.W.  He had been born with encephalitis and herpes, and required anti-viral medication as well as medication for seizures; it was reported that L.T.H. was not following up with his medical appointments or refilling his medications.  Then in October 2015, it was reported that L.T.H. had been arrested and was not able to pick her children up from daycare.  A petition to find J.W. a child in need of protection or services (CHIPS) was thus filed, and he

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] L.T.H.'s other children, both of whom had different adjudicated fathers, were removed from her care in May 2013 after it was discovered that L.T.H. had left them home alone.  L.T.H. was convicted of neglect for that incident.  Those children were in foster care when J.W. was born, but were returned to L.T.H.'s custody in March 2014.

was placed in foster care along with his brother.[3] D.W., Jr. remained incarcerated at a facility in Boscobel at that time.

¶4 The corresponding CHIPS order for J.W. filed in April 2016 listed a number of conditions his parents had to meet before they could regain custody of him. Those conditions included resolving their criminal cases and committing no further crimes; meeting all of J.W.'s medical, mental health, and special education needs; and demonstrating that they could provide a safe, stable home for J.W. Regular visitation with J.W. was also required.

¶5 A trial reunification with L.T.H. was attempted in December 2016. However, in July 2017, J.W. and his siblings were again detained by DMCPS due to ongoing domestic violence between L.T.H. and her significant other at that time.

¶6 Therefore, a Petition for the Termination of Parental Rights (TPR) was filed in November 2019. In the petition, the State's alleged grounds for termination with regard to D.W., Jr. included the continuing need of protection or services for J.W., pursuant to WIS. STAT. § 48.415(2), and the failure of D.W., Jr. to assume parental responsibility, pursuant to § 48.415(6).

¶7 The petition stated several bases for these grounds, beginning with the fact that J.W. had never lived with D.W., Jr. because he was incarcerated; the petition further noted that he would not be released until 2026. Furthermore,

---

[3] The CHIPS orders for J.W.'s siblings were still in effect at that time; the other sibling was placed with her father.

although D.W., Jr. had supervised visits with J.W., it was observed that he was not available to take custody of J.W. when placement for him was being sought.

¶8      Additionally, the TPR petition pointed out that D.W., Jr. had a "significant criminal history" which included "assault, several counts of taking and driving without owner's consent, theft, [a] sex offender violation, disorderly conduct, possession with intent, and second[-]degree reckless endangering [safety]." Based on these facts, the State asserted that D.W., Jr. was "not fit to be a parent" to J.W., and that termination of his parental rights was warranted.

¶9      D.W., Jr. entered a no contest plea to the failure to assume parental responsibility ground in April 2021. The matter then proceeded to disposition in March 2022.[4]

¶10      At the dispositional hearing, testimony was received from J.W.'s case manager. The case manager testified that J.W., who was then eight years old, had been in foster care since he was two-and-a-half years old. She stated that he had been placed with his current foster parent for over three years, and that he had a strong bond with her. The case manager noted that the foster parent was meeting all of J.W.'s special needs, which included speech issues, a seizure disorder, and an intellectual impairment. Additionally, the case manager discussed the strong bond between J.W. and his brother who had also been placed with that foster parent, and that the foster parent was an adoptive resource for both of them. The

_____

[4] The dispositional hearing as to L.T.H. was conducted in November 2021, and her parental rights to J.W. were terminated at that time; however, D.W., Jr. was not able appear in person for that hearing date, so a subsequent hearing date was scheduled for March 2022. The order of the trial court terminating L.T.H.'s parental rights was affirmed by this court in July 2022. *See State v. L.T.H.*, Nos. 2022AP56 and 2022AP57, unpublished slip op. (WI App July 19, 2022).

case manager stated that J.W. had expressed his desire to remain with the foster parent.

¶11 The case manager further testified that J.W. had never lived with D.W., Jr. because he had been incarcerated for J.W.'s entire life. The case manager acknowledged that there had been visitation between D.W., Jr. and J.W.; however, the visits were infrequent—they had occurred approximately twice a month in person before the pandemic, and then had occurred over video. The case manager stated that she did not believe that J.W. had a substantial relationship with D.W., Jr., due to the infrequency of contact between them. The case manager further noted that D.W., Jr.'s history of repeated incarceration, which dated back to when he was a juvenile, factored into the consideration of whether he would be able to provide a safe and stable home for J.W. upon his release.

¶12 D.W., Jr. called as a witness a family friend, T.M., who he thinks of as a grandmother. T.M. testified that she had talked to D.W., Jr. about the possibility of becoming J.W.'s guardian, but that she was first interested in meeting with J.W. to see if she would "be a good fit" for him, since she had not seen him since he was a baby. T.M. stated that she had been in contact with a social worker from DMCPS in January 2022 about setting up visitation, but that had never occurred. T.M. noted that she frequently travels to Houston, which may have been a factor in the failure to set up a visit. Furthermore, the case manager testified that DMCPS had not looked into a guardianship for J.W., and that she was not aware of any request made by T.M. for visitation or for an investigation into her qualifications as a potential guardian.

¶13 Other witnesses for D.W., Jr. included two individuals who had provided supervised visitation services for his visits with J.W. Both of these

visitation supervisors testified that the visits were positive: that J.W. was excited to see D.W., Jr., they talked and played games, and were affectionate toward one another. One of those witnesses said they had a "great relationship," and the other one described them as having a "father[-]son relationship." However, the case manager testified that it was reported that D.W., Jr.'s responses to J.W. during their conversations were sometimes "immature or inappropriate."

¶14 Nevertheless, D.W., Jr. testified that he loved J.W. and understood that it was his own fault that he was incarcerated and unable to "be there for [his] son." He noted that there is a possibility he could be granted early release in 2024. He stated that he had taken a parenting class in prison and wanted the opportunity to raise his son. He suggested that J.W. could continue living with his foster parent until D.W., Jr. was released from prison, and his counsel proposed that the foster parent could be appointed J.W.'s guardian during that time frame, as an alternative disposition to termination.

¶15 However, the trial court observed that its decision "[was] not about [D.W., Jr.]," and even though the court "wish[ed] that things were different" for D.W., Jr., it had to consider what is in the best interests of J.W. The court then discussed each of the statutory factors for determining the best interests of J.W., and ultimately decided that it was in his best interests to terminate D.W., Jr.'s parental rights. This appeal follows.

## DISCUSSION

¶16 On appeal, D.W., Jr. asserts that the trial court erroneously exercised its discretion in determining that the termination of his parental rights was in the best interests of J.W. "The ultimate determination of whether to terminate parental rights is discretionary with the [trial] court." *State v. Margaret H.*, 2000

6

WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475. We will uphold the decision if the trial court applied the correct standard of law to the facts of the case. *See id.*, ¶32.

¶17 In making the determination to terminate parental rights, "the best interests of the child is the paramount consideration" for the trial court. *Id.*, ¶33. The trial court's decision should reference the statutory factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon, in explaining on the record the basis for the disposition. ***Sheboygan Cnty. DHHS v. Julie A.B.***, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402.

¶18 The statutory factors that the trial court is required to consider are:

> **(a)** The likelihood of the child's adoption after termination.
>
> **(b)** The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> **(c)** Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> **(d)** The wishes of the child.
>
> **(e)** The duration of the separation of the parent from the child.
>
> **(f)** Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

¶19 The record indicates that the trial court referenced all of these factors with regard to J.W. in its decision, and found that the evidence relating to each factor weighed in favor of the termination of D.W., Jr.'s parental rights. Indeed,

7

D.W., Jr.'s argument on appeal is not that the court did not consider the statutory factors, but rather that it did not consider a dispositional alternative; namely, a guardianship by either T.M. or the foster parent.

¶20    While it is true that the trial court did not make any findings relating to the possibility of a guardianship, it was not required to do so.  D.W., Jr. cites **A.B. v. P.B.**, 151 Wis. 2d 312, 444 N.W.2d 415 (Ct. App. 1989), for the premise that "alternatives to termination must be explored."  *See id.* at 322.  However, the issue in **A.B.** was the voluntary termination of parental rights, with this court making the point that parental rights "may not be terminated merely to advance the parents' convenience and interests, either emotional or financial."  *Id.*  We thus find **A.B.** to be inapposite here.  Instead, we are directed by **Julie A.B.**, which states that while the parties "'may make alternative dispositional recommendations to the [trial] court,'" the trial court "*shall* consider" the best interest factors set forth in WIS. STAT. § 48.426(3).  **Julie A.B.**, 255 Wis. 2d 170, ¶29 (citation omitted).

¶21    Additionally, the statutes relating to minor guardianships provide relevant guidance.  Requests for the appointment of a guardian for a minor are subject to the requirements of WIS. STAT. § 48.9795 or, for a child in need of protection or services, WIS. STAT. § 48.977, both of which set forth procedures for filing petitions regarding such requests.  There was no guardianship petition pending for either T.M. or the foster parent at the time of the dispositional hearing, and therefore a potential guardianship for J.W. was not an issue that was before the trial court for consideration.

¶22    Furthermore, there was no evidence presented regarding the viability of a guardianship for either T.M. or the foster parent.  In fact, T.M.'s testimony

was not that she was committed to being J.W.'s guardian, but rather that she wanted visitation with him to determine whether his placement with her would be a "good fit." Thus, placement of J.W. with T.M., who is not a blood relative of D.W., Jr., would simply be another foster care placement. However, J.W. has been placed with his current foster parent long-term and has bonded with her. Furthermore, as previously noted, she is an adoptive resource for him. The likelihood of adoption is a required statutory factor for consideration, and therefore the trial court properly considered J.W.'s current placement and his relationship with his foster parent from the perspective of his potential adoption by her. *See* WIS. STAT. § 48.426(3)(a).

¶23 That said, the only required factor that seems to relate to D.W., Jr.'s argument on this issue is the substantial relationship factor and the potential harm that could result from legally severing such a relationship. *See* WIS. STAT. § 48.426(3)(c). When the trial court considered this factor, it recognized that J.W. loved D.W., Jr, but found that the stronger bond was with his brother who was placed with the same foster parent and with whom he would presumably be adopted. Thus, in weighing all of the evidence relating to this factor, the court determined that it more aptly supported termination. *See **Margaret H.***, 234 Wis. 2d 606, ¶35.

¶24 In sum, the trial court considered all of the required statutory best interest factors of WIS. STAT. § 48.426(3) as they related to the evidence in this case. It thus applied the correct standard of law to the facts of the case, and therefore did not erroneously exercise its discretion in determining that it was in J.W.'s best interests to terminate D.W., Jr.'s parental rights. *See **Margaret H.***, 234 Wis. 2d 606, ¶32. Accordingly, we affirm.

9

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.